2003 VT 12

# Morris R. Glidden v. Nyoakla Lynn Conley

[820 A.2d 197]

No. 00-491

Present: Amestoy, C.J., Dooley, Morse,[1] Johnson and Skoglund, JJ.

Opinion Filed February 14, 2003

---

[1] Justice Morse was present when the case was submitted on the briefs but did not participate in this decision.

112

*Margot L. Stone* and *Amy Phillippo*, Newfane, for Plaintiff-Appellant.

*Lois Mech*, Pro Se, Putney, Defendant-Appellee.

*William H. Sorrell*, Attorney General, Montpelier, and *Les Birnbaum*, Assistant Attorney General, Waterbury, for Intervenor.

¶ 1.  **Skoglund, J.** Appellant Morris Glidden appeals from a Windham Family Court order denying his motion to reconsider the court's award of visitation rights to Lois Mech, the maternal grandmother of Glidden's biological daughter, Amanda. Glidden, whose parental fitness is unquestioned, argues that the court's order deprives him of his constitutionally-protected right to decide whether, and on what terms, his daughter should have contact with her grandmother. We agree, and hold that the court unconstitutionally applied the statute governing grandparent visitation. We therefore reverse the visitation order.

¶ 2.  Morris Glidden and Nyoakla Conley are the biological parents of Amanda May Conley, born on July 2, 1992. Lois Mech is Nyoakla Conley's mother and Amanda's maternal grandmother. Glidden and Conley were never married and never cohabitated. Glidden did not learn of his paternity until a 1995 probate proceeding through which Conley, who has a history of substance abuse and criminal conduct, was agreeing to relinquish her parental rights and place Amanda with adoptive parents. Upon discovering his paternity, Glidden sought to end the probate proceeding and establish a visitation schedule with Amanda by commencing a parentage proceeding in family court. He also began contributing financial support for his daughter. At the time, Glidden did not have an appropriate home for Amanda so Glidden, Conley, and Mech agreed that Mech would become Amanda's legal and physical guardian. The family court, which granted a motion to transfer the probate proceeding to the family court and consolidate it with the parentage action, approved the agreement. Thus, in January 1996, the

court established a visitation schedule with Amanda for Glidden and Conley. Glidden eventually married, and he continued regular visits with Amanda until her behavioral problems became disruptive for him and all concerned. Glidden voluntarily suspended his visits with Amanda and urged Mech to obtain counseling for her, while he continued to contribute financial support for Amanda.

¶ 3. Less than two years later, Glidden attempted to renew visitation with his daughter. His efforts were rebuffed and resulted in frequent disagreements between him, Mech, and Conley. In April 1998, Mech moved to modify the January 1996 order to allow only supervised visits between Glidden and Amanda. The next month, Glidden moved to enforce the January 1996 order. Following the hearing on the motions, the court established a new temporary visitation schedule for Glidden and ordered a study of the Glidden and Mech households.

¶ 4. The home study was filed on September 15, 1998.[2] Along with the home study, Glidden filed a petition to dismiss Mech as Amanda's guardian and to obtain custody of his daughter. The court thereafter entered another temporary order on visitation between Glidden and Amanda based on another agreement between the parties.

¶ 5. In August 1999, Glidden, Conley, and Mech entered into yet another agreement on custody and visitation. Under the agreement, which the court approved on August 31, 1999, Mech resigned guardianship of Amanda, and Glidden and Conley shared physical and legal custody of her, although Glidden became Amanda's primary physical custodian. The parties also agreed that if either parent was cited by law enforcement for any criminal offense involving drugs or alcohol the nonoffending parent would immediately be entitled to sole custody of Amanda. Conley was unable to maintain her sobriety and was charged in district court for disorderly conduct. Accordingly, pursuant to the parties' agreement, and by order of the family court, Glidden became sole legal and physical custodian of Amanda on May 15, 2000. Conley was still allowed visitation with Amanda one day per weekend, followed by full weekends upon satisfactory completion of a drug and alcohol rehabilitation program.

¶ 6. Mech was seeing Amanda once a week for three hours at a time during Amanda's visits with Conley when, in July 2000, she filed a request for visitation pursuant to Vermont's grandparent visitation statute, 15 V.S.A. § 1011(a). Her petition did not contain any allegations that Glidden had unreasonably denied her contact with Amanda. Instead, she

---

[2] The home study recommended that Amanda reside with Glidden and his family. The record is unclear, however, about what use, if any, the court made of the study.

expressed "fear" that he would prohibit her from seeing the child without a court-ordered visitation schedule. After a hearing, the court, on August 4, 2000, granted temporary visitation every other Saturday from 10:00 a.m. until 4:00 p.m. at Mech's home. Additionally, the court ordered Glidden to allow Mech to transport Amanda for a four-hour visit with Conley each Sunday at the Massachusetts long-term residential rehabilitation center where Conley resided and was receiving treatment.

¶ 7. On August 18, 2000, Glidden moved to reconsider the visitation award arguing that the court's failure to consider the decision of a fit parent violated his Fourteenth Amendment right to raise his child without undue interference by the state, relying on the United States Supreme Court decision in *Troxel v. Granville*, 530 U.S. 57 (2000).

¶ 8. Further, Glidden had discovered that a family friend living in Mech's household, to whom Amanda refers as "Uncle David," is a convicted sex offender. "Uncle David's" conviction stemmed from a sex offense against Conley when she was a minor, but he nevertheless has lived as a family member in the Mech household since 1980. Although Glidden was supportive of visitation between his daughter and Mech because of the child's relationship with her, he was concerned about a sex offender's presence with Amanda during their visits. He also claimed Mech had misled him about the identity of Conley's abuser.

¶ 9. The court affirmed the order following a hearing where it took evidence on whether it "should substitute its judgment on grandparent visitation for that of Mr. Glidden." The court found that Mech gave Glidden false information about the sex offender, that there had been questionable incidents between the offender and Amanda, and that Glidden's concern about the presence of the offender in Mech's home was valid. The court also found it likely that conflict between Glidden and Mech over visitation would continue without a court order structuring the visits between Amanda and her grandmother. It stated that Glidden's concern about the sex offender was "likely to have the effect of causing him to be overly concerned and restrict[ive of] the amount of contact between Amanda and Ms. Mech that even he believes is otherwise good for Amanda." The court therefore denied Glidden's motion, but modified the order to prohibit Mech from allowing the sex offender to be in Amanda's presence during their visits. Glidden thereafter took this appeal.

¶ 10. On appeal, Glidden argues that the family court's order and the grandparent visitation statute unconstitutionally infringe on his right to parent Amanda by not affording his parental decision regarding visitation sufficient deference in light of his fitness to adequately parent his

daughter. Because Glidden is challenging the constitutionality of the statute, the Vermont Attorney General's Office intervened for the State in this appeal, and argues for a constitutional construction of the statute. For the reasons that follow, we agree with the State that the statute is not unconstitutional on its face, but we reverse the family court's order because we find meritorious Glidden's claim that the statute exceeds constitutional boundaries as applied in this case.

¶ 11.   We review an order granting visitation to determine whether the court exercised its discretion on grounds that are clearly unreasonable or untenable. *Cleverly v. Cleverly*, 151 Vt. 351, 355-56, 561 A.2d 99, 102 (1989). When considering the constitutionality of a statute we begin by presuming that the legislative enactment is constitutional. *In re Proceedings Concerning a Neglected Child*, 129 Vt. 234, 240-41, 276 A.2d 14, 18 (1971). In the absence of "clear and irrefragable evidence that [the statute] infringes the paramount law," we will not strike down a statute as unconstitutional. *Id.* Moreover, if we can construe the statute in a manner that meets constitutional requirements, we will do so unless the statute's plain language precludes it. *In re Montpelier & Barre R.R.*, 135 Vt. 102, 103-04, 369 A.2d 1379, 1380 (1977). Therefore, we examine Vermont's grandparent visitation statute in the context of the visitation order at issue in this appeal to determine whether the court abused its discretion by applying the statute in a manner that infringes on Glidden's right to raise Amanda without interference by the state.

¶ 12.   The United States Supreme Court has "long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974). The interest of a parent in the custody, care, and control of his child may be the oldest of the fundamental liberty interests our federal constitution protects. *Troxel*, 530 U.S. at 65; *In re S.B.L.*, 150 Vt. 294, 303, 553 A.2d 1078, 1084 (1988). The state must generally show a compelling interest "before it encroaches upon the private realm of family life." *In re Proceedings Concerning a Neglected Child*, 130 Vt. 525, 530, 296 A.2d 250, 253 (1972). Indeed, there is a "presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. "[S]o long as a parent adequately cares for his or her children (*i. e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

¶ 13.   That principle was central to the United States Supreme Court's plurality holding in *Troxel v. Granville*, where the Court held that a Washington statute providing for grandparent and other third-party visitation was unconstitutionally applied. *Id.* at 67.[3] The Washington statute at issue was "breathtakingly broad" because it allowed " 'any person' " to petition the court for visitation rights " 'at any time,' " and authorized the court to grant a petition whenever " 'visitation may serve the best interest of the child.' " *Id.* (quoting Wash. Rev. Code § 26.10.160(3) (1994)). Of particular concern to the plurality was that in applying the statute to a grandparent's request for visitation, the Washington court afforded no deference to a parent's determination of the child's best interests. *Id.* at 67-69. The statute lacked any

> requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests.

*Id.* at 67 (emphasis in original).

¶ 14.   The Supreme Court concluded that the Washington statute was unconstitutional as applied in *Troxel* due to the absence of any consideration of, or deference to, the parent's decision regarding grandparent-child contact. *Id.* It also recognized that the burden of litigation in a domestic relations proceeding can itself so disrupt the

---

[3] Justice O'Connor's opinion was joined by Chief Justice Rehnquist and Justices Ginsburg and Breyer. See *Troxel*, 530 U.S. at 59. Justices Souter and Thomas concurred in the judgment, but rendered separate concurring opinions. See *id.* at 75 (Souter, J., concurring) and 80 (Thomas, J., concurring). Like the plurality, Justice Souter was concerned that the Washington statute did not give any presumptive weight to the custodial parent's visitation decision, but he concluded that the Washington statute was facially unconstitutional because of its broad sweep. *Id.* at 76-77, 79 (Souter, J., concurring). Justice Thomas opined that he would affirm the judgment below on the grounds that the state had failed to demonstrate "even a legitimate governmental interest — to say nothing of a compelling one — in second-guessing a fit parent's decision regarding visitation with third parties." *Id.* at 80 (Thomas, J., concurring). Justices Stevens, Scalia, and Kennedy each wrote separate dissenting opinions. See *id.* at 80 (Stevens, J., dissenting), 91 (Scalia, J., dissenting), and 93 (Kennedy, J., dissenting).

parent-child relationship that the custodial parent's constitutional right to make basic determinations for a child's well being can be jeopardized. *Id.* at 75; see also *id.* at 101 (Kennedy, J., dissenting).

¶ 15.  Our cases involving conflict between a custodial parent's right to make decisions for the child and a noncustodial parent's right to visitation recognize the need for judicial deference to the custodial parent's decision about the child's best interests. In *Lane v. Schenck*, we observed that "[w]hile the policy promoting visitation must be considered, concerns relating to it must not overshadow the proper role of the custodial parent." 158 Vt. 489, 499, 614 A.2d 786, 791 (1992). We further explained that "[v]isitation should function to foster beneficial relations between the children and the noncustodial parent, but visitation does not warrant nullification of the custodial parent's reasonable decisions." *Id.*; see also *McCart v. McCart*, 166 Vt. 629, 630, 697 A.2d 353, 353 (1997) (mem.) (court improperly substituted its judgment for custodial parent's by prohibiting custodial parent from moving solely because move would disrupt father's visitation with children). Thus, our cases have already recognized the *Troxel* principle of deferring to a custodial parent's decision regarding the welfare of the child, even when the decision conflicts with the associational interest of the child's noncustodial parent as protected by state statute. See 15 V.S.A. § 650 (public policy expressed by Legislature favors opportunity for maximum parent-child contact following divorce or separation unless significant physical or emotional harm to child or parent would likely result from contact).

¶ 16.  Those decisions are relevant to put Mech's claim here in proper perspective. At common law, grandparents had no rights of visitation by virtue of their status as grandparents. *Troxel*, 530 U.S. at 97 (Kennedy, J., dissenting); Note, *Grandparent Visitation Statutes: Do Legislatures Know the Way to Carry the Sleigh Through the Wide and Drifting Law?*, 53 Fla. L. Rev. 321, 325 (2001). At common law, a parent's obligation, if any, to facilitate a relationship between the child and the child's grandparents was a moral one only. *Troxel*, 530 U.S. at 97 (Kennedy, J., dissenting); *Grandparent Visitation Statutes, supra*, at 324 n.12. Now, all fifty states have statutes that provide for grandparent visitation in some form. See L. Nolan, *Beyond Troxel: The Pragmatic Challenges of Grandparent Visitation Continue*, 50 Drake L. Rev. 267, 267 n.2 (2002).

¶ 17.  It is no surprise to learn then that after the United States Supreme Court issued *Troxel*, a number of other states were confronted with challenges to their grandparent visitation statutes. Although state statutes vary, courts in states with statutes more limited than the one at issue in *Troxel* have reversed visitation orders on due process grounds

where the lower court failed to employ a presumption in favor of the fit parent's visitation decision. See, e.g., *McGovern v. McGovern*, 33 P.3d 506, 511-12 (Ariz. Ct. App. 2001) (construing state statute consistent with due process by requiring court to apply rebuttable presumption that fit parent acts in child's best interests); *Seagrave v. Price*, 79 S.W.3d 339, 345 (Ark. 2002) (trial court's failure to apply a presumption in favor of custodial parent's decision regarding visitation renders order unconstitutional); *State Dep't of Soc. & Rehab. Servs. v. Paillet*, 16 P.3d 962, 970 (Kan. 2001) (grandparent visitation order reversed because trial court made no presumption that fit parent acts in child's best interests); *Roby v. Adams*, 68 S.W.3d 822, 828 (Tex. Ct. App. 2002) (grandparent has burden to overcome presumption in favor of fit parent's decision to establish best-interests-of-child prong of grandparent visitation statute); see also *Wickham v. Byrne*, 769 N.E.2d 1, 7-8 (Ill. 2002) (holding section of grandparent visitation statute facially unconstitutional because it requires finding of best interests of child only and does not give parental decision presumptive weight); *Blixt v. Blixt*, 774 N.E.2d 1052, 1060 (Mass. 2002) (saving grandparent visitation statute from facial constitutional challenge by reading into statute a presumption in favor of parent's visitation decision). The presumption in favor of the fit parent's decision reflects Justice O'Connor's observation in the *Troxel* plurality opinion:

> [T]he decision whether . . . an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.

*Troxel*, 530 U.S. at 70.

¶ 18. Other state cases have relied on the lack of compelling circumstances to justify overturning state-sanctioned and judicially-enforceable visitation orders in light of the parent's constitutional interests. See, e.g., *Linder v. Linder*, 72 S.W.3d 841, 857 (Ark. 2002) (strict scrutiny analysis applies and requires compelling state interest to overcome presumption in favor of fit parent's choice); *Stacy v. Ross*, 99-CA-00579-SCT, ¶ 23, 798 So. 2d 1275 (Miss. 2001) (grandparent seeking visitation must show compelling circumstances to override parent's visitation decision); see also *Blixt*, 774 N.E.2d at 1059-60 (grandparent may rebut presumption in favor of fit parent by showing significant harm to child will result from lack of visitation order because state has compelling interest to protect children from harm). At least one state

court overturned a visitation order concluding that the litigation's intrusiveness resulted in an unconstitutional application of the grandparent visitation statute. *Wilde v. Wilde*, 775 A.2d 535, 545-46 (N.J. Super. Ct. App. Div. 2001); see also *Blixt*, 774 N.E.2d at 1066 (recognizing burden of litigation on parents, court requires grandparent to submit detailed and verified petition to show grandparent can meet evidentiary burden because notice pleading is not adequate to safeguard parents from unwarranted grandparent visitation petitions).

¶ 19. On its face, Vermont's grandparent visitation statute makes no provision for deference to parental decision making as required under *Troxel* and our own precedent. Granted, the statute does not suffer from the "breathtakingly broad" "any person" language in Washington's statute, as characterized by Justice O'Connor's plurality opinion in *Troxel*, because the statute is limited to visitation for grandparents only. The statute broadly permits the family court, however, to "award visitation rights to a grandparent of the child, upon written request of the grandparent filed with the court, if the court finds that to do so would be in the best interest of the child." 15 V.S.A. § 1011(a). Section 1013(b) provides criteria for the court to employ when considering whether grandparent visitation is in the child's best interests, but the custodial parent's decision on the question is not among them. See 15 V.S.A. § 1013(b) (listing mandatory criteria). Although the statute does not afford grandparents party status or appeal rights, see *id.* § 1011(b), (c), it allows them to move for enforcement of the order as would any party. *Id.* § 1011(d).

¶ 20. Like the Washington statute, the Vermont statute commands consideration of the "best interest of the child," *id.* § 1011(a), and as a result, carries the same risk of unconstitutional application — that it may effect the same deprivation of fundamental parental rights suffered under the Washington court order in *Troxel*. Although the "best interests of the child" standard is familiar, see, e.g., 15 V.S.A. § 665 (setting forth best interests standard to determine parental rights and responsibilities in a divorce proceeding), the grandparent visitation statute uses the standard in a new context. Based on the plurality's reasoning in *Troxel*, the standard, left unspecified and undefined, cannot survive a due process challenge. It is for this Court, therefore, to construe this statute to render it constitutional. *Montpelier & Barre R.R.*, 135 Vt. at 103-04, 369 A.2d at 1380. We conclude that § 1011's "best interests" consideration can be construed within the context of the grandparent visitation statute to satisfy due process.

¶ 21. To accord with due process, an evaluation of the best interests of the child under § 1011 requires that a parental decision concerning grandparent visitation be given a presumption of validity. See *Troxel*, 530 U.S. at 69; *McGovern*, 33 P.3d at 511-12; *Seagrave*, 79 S.W.3d at 345; *Paillet*, 16 P.3d at 970; *Roby*, 68 S.W.3d at 828. A grandparent may rebut that presumption by providing evidence of compelling circumstances to justify judicial interference with the parent's visitation decision. *Stacy*, 99-CA-00579-SCT, ¶ 23, 798 So. 2d 1275. That a child might benefit from contact with a grandparent or that a parent might deny grandparent visitation for no good reason in the court's view are not the kind of compelling circumstances contemplated by the Constitution or this decision. Rather, to overcome a parent's decision on grandparent visitation, a grandparent must show circumstances like parental unfitness, see *Linder*, 72 S.W.3d at 858 (some special factor like unfitness of custodial parent must exist to justify state interference in parent's right to decide grandparent visitation issue); *Stacy*, 99-CA-00579-SCT, ¶ 23, 798 So. 2d 1275 (compelling circumstances suggesting something close to unfitness of custodial parent may be sufficient to justify visitation award to grandparents over parent's objection), or significant harm to the child will result in the absence of a visitation order (thus suggesting parental unfitness), see *Linder*, 72 S.W.3d at 858 (harm to the child in absence of visitation order may warrant overriding parent's visitation decision); *Blixt*, 774 N.E.2d at 1060 (to rebut presumption in custodial parent's favor, grandparent must prove that failure to grant visitation will "cause the child significant harm by adversely affecting the child's health, safety, or welfare"). This construction of the statute minimizes the risk that a court will substitute its judgment for that of the parent simply because the court disagrees with the parent's decision. Our construction of the statute also recognizes that a dispute between a fit custodial parent and the child's grandparent over grandparent visitation "is not a contest between equals." *Stacy*, 99-CA-00579-SCT, ¶ 23, 798 So. 2d 1275; see also *Wickham*, 769 N.E.2d at 7-8 (finding unconstitutional a statute that places parent on equal footing with third parties seeking visitation with the child). Because we can construe Vermont's grandparent visitation statute consistent with constitutional requirements, Glidden's facial challenge to the statute must fail.

¶ 22. Having concluded that Vermont's grandparent visitation statute is not facially invalid, we now turn to Glidden's claim that the family court applied the statute in a manner that violated his constitutional rights. Two reasons persuade us that the family court's order impermissibly infringes on Glidden's right to decide what visitation

is in his daughter's best interests. First, there was no allegation or finding that Glidden was not fit to parent Amanda; in fact, he was her sole legal and physical custodian. Second, there was no allegation or finding that Amanda would suffer significant harm without court-ordered visits with Mech. Glidden testified, and the court found, that he wants his daughter to maintain a relationship with her grandmother, but wanted a limited visitation schedule of his choosing. Critically, the court acknowledged that Glidden had a reasonable and justifiable reason for his reluctance to grant the visitation Mech sought due to a convicted sex offender's presence in her household. Nevertheless, the court shared Mech's fear that Glidden might restrict visits due to his concerns about his daughter's well being while in her care. As a result of that fear, and the history of conflict between Mech and Glidden, the court decided to "substitute it's [sic] judgment over the discretion of the father in terms of the scheduling and requirement for grandparent visitation." The order reads as if the court presumed visits with Mech were in Amanda's best interests and that Glidden's desire to limit or condition such visits was insufficient to overcome that presumption. In effect, the court employed a presumption directly contrary to that required by constitutional precedents, namely, that a fit parent's decision governs in a dispute about visitation between the child and a third party, including the child's grandparent. The court's rationale for entering an enforceable visitation order — to eliminate the potential for Glidden to restrict visitation due to his otherwise valid parental concerns — is far from compelling, and, standing alone, is not enough to sustain the decision. The court's order is thus precisely the type of decision making which, by disregarding and giving no deference to a fit custodial parent's determination of the child's best interests, exceeds the bounds of the Due Process Clause, violates Glidden's fundamental rights, and was held unconstitutional in *Troxel*. See *Troxel*, 530 U.S. at 69-70.

¶ 23. Obviously the court will often "differ with the custodian as to the wisdom of a certain parental decision." *Lane*, 158 Vt. at 496, 614 A.2d at 790. It may not, however, "lightly replace the judgement of the custodian with its own." *Id.* Because of the long-standing recognition of the right to raise children free from state interference, "[i]t would be anomalous, then, to subject a parent to any individual judge's choice of a child's associates from out of the general population merely because the judge might think himself more enlightened than the child's parent." *Troxel*, 530 U.S. at 79 (Souter, J., concurring).

¶ 24. Although we conclude that the trial court's failure to defer to Glidden's decision on visitation without a showing of compelling circumstances requires us to reverse the order, we elaborate on one other

significant aspect of this case that further supports our decision. As Justice Kennedy's dissent in *Troxel* explained, the litigation of visitation disputes can be so disruptive to the parent-child relationship that the proceeding itself can have constitutional implications. *Troxel*, 530 U.S. at 101 (Kennedy, J., dissenting); see also *Beyond Troxel, supra,* at 287-88 (discussing financial and other intangible costs of grandparent visitation litigation). Although the Legislature has restricted a grandparent's party status and appeal rights under the grandparent visitation statute, see 15 V.S.A. § 1011(b), (c), a court-sanctioned visitation schedule is enforceable, and a parent who disobeys the order may be held in contempt. See *id.* § 1011(d); 12 V.S.A. § 122; see *Beyond Troxel, supra,* at 285. The ability to enforce an order, and the availability of contempt to redress a parent's otherwise reasonable decision on visitation, can allow the grandparent to assert considerable control over the family. Grandparents may turn to the court for relief each time they perceive the parent is not following the court order and thereby ask the court to micromanage the parent's otherwise constitutionally protected right to raise the child free from state interference. See *Beyond Troxel, supra,* at 286; see also *Wilde,* 775 A.2d at 545 ("Because the litigation itself 'implicates' the parent's constitutional rights, a grandparent's statutory right to hale a parent into court must be carefully circumscribed, particularly where . . . the parent's fitness is not disputed.").

¶ 25.  In this case, since Amanda established a relationship with her father and became a member of his household, a significant amount of conflict about contact between her and Mech has occurred, requiring numerous court proceedings. Those proceedings, and the potential for further proceedings related to the visitation order here, can be considered so burdensome to Glidden that his right to raise Amanda without interference by the state is implicated. See *Troxel,* 530 U.S. at 75 (recognizing that parent's constitutional right to raise child can be implicated by burden of litigating domestic relations proceeding). Therefore, our decision today circumscribes Mech's statutory right under § 1011 so as to protect Glidden's constitutional rights to raise Amanda without having to justify his decisions to the state.

¶ 26.  In an ideal world, going over the river and through the woods to grandmother's house might bring nothing but joy to all concerned. However, in this case, as the trial court acknowledged, the child's father had good reason to question the wisdom of allowing the amount of unrestricted visitation grandmother requested. The court's decision in effect found father a fit parent for all purposes save one: making the decision about how often and in what manner his child would visit with the

grandmother. In so deciding, the court erred and its decision cannot stand.

*Reversed.*

---

[1] Justice Morse sat for oral argument but did not participate in this decision.